**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| LAURA A MALASKA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL NO. 2:16-CV-117 |
| | § | |
| SALDIVAR COASTAL SERVICES, INC.; | § | |
| dba SALDIVAR PRIMARY HOME | § | |
| CARE, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The Court has before it Plaintiff's Motion for Conditional Certification in this putative collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Dkt. No. 24. After considering the motion, the complaint, the accompanying evidence, the parties' arguments, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion.

## I.     Background

Plaintiff Laura A. Malaska ("Malaska") brings this wage-and-hour case against Defendant Saldivar Coastal Services, Inc. ("SCSI") under the collective-action provision of the FLSA, 29 U.S.C. § 216(b). SCSI provides in-home services to elderly and infirm clients. To provide these services, SCSI employs domestic service workers called "providers." Malaska was employed by SCSI as a provider from approximately October 2009 until June 2016. Malaska filed her complaint on April 12, 2016. On October 4, 2016, Malaska filed the instant Motion for Conditional Certification. Dkt. No. 24. Malaska defines the proposed class as follows:

> All Providers employed by Saldivar Coastal Services, Inc. during any workweek during the period of January 1, 2015 to the present."

Dkt. No. 24-5 at 1.

On November 21, 2016, SCSI filed its response in opposition to the Motion for Conditional Certification. Dkt. No. 29. SCSI also filed objections to a declaration made by Malaska in support of her motion. Dkt. No. 30 (objecting to Dkt. No. 24, Ex. 1). On December 2, 2016, Malaska filed her reply in support of the motion and a response to Defendant's objections to her declaration. Dkt. Nos. 31, 32.

SCSI employs approximately 1,400 Providers and provides domestic care services in thirty-four (34) counties in Texas. SCSI's Providers offer bathing care, grooming and toiletry care, transfer and ambulation care, meal preparation, and cleaning and laundry services to their clients. Dkt. No. 24 at 5; Dep. of Margot Saldivar ("Saldivar"), SCSI's President, Dkt. No. 24, Ex. 2, p. 9, line 9 to p. 10, line 5. Malaska alleges that SCSI is in violation of the FLSA because (1) it did not pay Providers for all of the hours that they worked, including time spent driving between clients' homes and attending mandatory meetings, and (2) Providers were not paid the correct overtime rate of pay when they worked more than forty hours in a work week. *See* Dkt. No. 24 at 6–8; Dkt. No. 24-3 at 1.[1] Malaska seeks to certify as a class all of SCSI's 1,400 providers.

With regards to the off-the-clock claim, the parties are in agreement that SCSI's providers were only permitted to record the time that they actually spent at their clients' homes, and were not permitted to record the time spent driving in between clients' homes. Dkt. No. 24 at 6; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 63, lines 18-25 and p. 64, line 21 to p. 65, line 20.[2] Malaska argues that this violates the FLSA wage and hour provisions. Dkt. No. 24 at 6–7. Additionally, the evidence is uncontested that SCSI issued a memorandum notifying SCSI providers about a "mandatory" meeting to orient providers on how to use a new time-keeping system,

---

[1] SCSI refers to these claims as the "off-the-clock claim" and the "unpaid overtime claim," respectively. See Dkt. No. 29 at 5.

[2] Saldivar testified in her deposition:

      Q. Okay. So in neither of these two time-keeping systems is the employee paid for the drive time that they spend between customers, between clients' homes, right?

      A. Right.

Dkt. No. 24-2, Saldivar Dep., page 64, line 21 to page 65, line 20.

the Electronic Visit Verification ("EVV") system.[3] Dkt. No. 24, Ex. 1-F; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 74, lines 16-25. SCSI did not permit Malaska or other providers to record their time at the meeting and did not pay Malaska or the other providers for attending the meeting. Dkt. No. 24 at 7; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 74, line 16 to p. 75, line 12. SCSI did not pay any of its providers (or administrative staff) who attended the meetings at other locations. *Id.* Dkt. No. 24 at 7; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 78, lines 13-24.

As to the unpaid overtime claim, Malaska alleges that, even without counting travel time between clients' homes, SCSI does not pay Malaska or the other Providers the correct overtime rate of pay for overtime hours worked. Dkt. No. 24 at 8. SCSI alleges that it only employs around fifty (50) full-time providers, and attaches the deposition of Saldivar stating that SCSI employs "maybe 50" full-time providers, whose "schedule[s] [are] set 40 hours or 41 hours." Dkt. No. 29, Ex. 1, p. 25, line 23 to p. 27, line 20. Malaska replies by pointing out that SCSI ignores the fact that the travel time could have pushed certain workers into an overtime opportunity, thereby creating more than 50 employees who are not receiving adequate overtime wages. Dkt. No. 32 at 6. Malaska further argues that notice "should go out to all 1,400 providers in order to advise them of the wage violations alleged and invite them to join the lawsuit . . . . Once they join, discovery will be conducted to determine the extent of each opt in claimaint's damages." *Id.* at 6–7.

## II.    Legal Rule

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v.*

---

[3] The Court notes that the deposition testimony of Saldivar appears to acknowledge that the meeting was "mandatory," but qualifies the term.

> Q. [ . . . ] And this was a mandatory meeting, right?
> A. It's—it was mandatory, as far as it was going to be available for them to make it. Now, I did not have everybody show up. If anything, it was the ones who were really concerned and wanted to know, and it was very beneficial for the ones who did take advantage of the meeting.

Saldivar Dep., Dkt. No. 24, Ex. 2, p. 74, lines 16-25.

*Symczyk*, 133 S. Ct. 1523, 1527 (2013). Section 216(b) creates a cause of action for employees against employers violating FLSA requirements.

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (2016). Courts routinely refer to FLSA actions brought by an employee for and on behalf of other employees under this provision as "collective actions." *Genesis Healthcare*, 133 S. Ct. at 1527 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169–70 (1989)). Unlike a class certified pursuant to Federal Rule of Civil Procedure 23, under the FLSA, " 'conditional certification' does not produce a class with an independent legal status, or join additional parties to the action." *Id.* at 1530. Rather, the "sole consequence" of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court. *Id.*; *see also Hoffmann-La Roche*, 493 U.S. at 171–72. District courts have discretion in deciding whether to order notice to potential plaintiffs. *Aguirre v. SBC Communications, Inc.*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *15 (S.D. Tex. April 11, 2006) (Rosenthal, J.) (citing *Hoffmann-La Roche*, 493 U.S. at 170–71).

District courts generally take one of two different approaches to conditional certification. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995). The first is commonly referred to as the "Shushan approach," which treats certification of a collective action under the FLSA and certification of a class under Rule 23 identically, requiring the plaintiff to establish numerosity, commonality, typicality, and adequate representativeness. *See Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990). The second is a "two-step ad hoc approach" that was utilized in *Lusardi v. Xerox Corp.*, 118 F.R.D 351 (D. N.J. 1987).

The Fifth Circuit has not determined which method is most appropriate; however, since *Mooney*, the Fifth Circuit has acknowledged the inapplicability of Rule 23 to § 216(b) actions. *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 (5th Cir. 2005). This Court routinely utilizes the *Lusardi* approach. *Jaso v. Bulldog Connection Specialists, LLC*, 2015 WL 11144603 at *2 (S.D. Tex. Oct. 15, 2015) (Tagle, J.); *see also Perez v. Valdez*, No. 1:13-CV-149, Slip Op. at 5 (S.D. Tex. Sept. 26, 2014) (Tagle, J.). The parties to this action do not dispute that district courts in the Fifth Circuit typically use the *Lusardi* approach. *See* Dkt. No. 24 at 3; Dkt. No. 29 at 1.

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213. The *Lusardi* "two-step" method involves a dual step analysis of Section 216(b)'s "similarly situated" requirement. *Mooney*, 54 F.3d at 1214; *Kaluom v. Stolt Offshore, Inc.*, 474 F. Supp. 2d 866, 871 (S.D. Tex. Feb. 7, 2007). The two steps consist of a lenient "conditional certification" decision made at the so-called "notice stage," followed by a more rigorous analysis of the similarly situated issue typically precipitated by a motion for "decertification" after discovery is largely complete and the matter is ready for trial. *Mooney*, 54 F.3d at 1214.

At the first *Lusardi* stage, the district court makes a decision—usually based only on the pleadings and any affidavits that have been submitted—whether notice of the action should be given to potential class members. *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *3 (citing *Mooney*, 54 F.3d at 1213–14). The district court makes its stage one decision by "determin[ing] whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class." *Id.*; *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010) (citing *Mooney*, 54 F.3d at 1213–14). Because the court has minimal evidence before it at this stage, the district court's determination is made using a fairly lenient standard, and typically results in conditional

certification of a representative class that provides potential class members with notice and the opportunity to opt-in. *Mooney*, 54 F.3d at 1214 n.8; *McKnight v. D. Houston, Inc.,* 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010). If a court conditionally certifies a class, the action proceeds as a collective action during discovery. *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *16 (citing *Mooney*, 54 F.3d at 1214).

The second stage of the *Lusardi* approach—the "decertification stage"—is typically precipitated by the defendant filing a motion to decertify after the opt-in period has concluded and discovery is largely complete. *Id.* (citing *Mooney*, 54 F.3d at 1214). "At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Id.* If the court finds the claimants are no longer made up of similarly situated persons, it decertifies the class and dismisses the opt-in plaintiffs without prejudice; if the class is still similarly situated, the court allows the collective action to proceed. *Id.* At no point in the certification process may the court "address the merits of the claims . . . by ruling on factual disputes or making credibility determinations." *Nieddu v. Lifetime Fitness, Inc.*, 977 F. Supp. 2d 686, 691 (S.D. Tex. 2013) (citing *Mooney*, 54 F.3d at 1214); *accord. McKnight*, 756 F. Supp. 2d at 802.

While the notice stage standard is lenient, it is not automatic. *In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, No. H-11-2266, 2012 WL 3308880, at *24 (Miller, J.) (citing *Badgett v. Tex. Taco Cabana, L.P.*, No. H–05–3624, 2006 WL 2934265, at *2 (S.D. Tex. Oct. 12, 2006)). The plaintiff bears the burden of making a preliminary factual showing that a similarly situated group of potential plaintiffs exists. *Id.* To establish this, the plaintiff must make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit. *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *2 (Tagle, J.); *Rueda v. Tecon Services, Inc.*, No. H-10-4937, 2011 WL

2566072, at *2 (S.D. Tex. June 28, 2011) (Rosenthal, J.); *Maynor v. Dow Chem. Co.*, No. G–07–0504, 2008 WL 2220394, at *6 (S.D. Tex. May 28, 2008); *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *19.

"A factual basis for the allegations is needed to satisfy this first step." *Rueda*, No. H-10-4937*, 2011 WL 2566072, at *2; *Hall v. Burk*, 2002 U.S. Dist. LEXIS 4163, at *3 (N.D. Tex. Mar. 11, 2002) (stating that "unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden."). Without more, general allegations that an employer violated the FLSA do not ordinarily suffice to establish that other similarly situated employees exist. *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *3 (citing *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983)); *see also Xavier v. Belfour USA Grp., Inc.*, 585 F. Supp. 2d 873, 877 (E.D. La. 2008) ("Although the 'similarly situated' standard is lenient at the notice stage, general allegations that the employer violated the FLSA are insufficient."). "Even this lenient standard appears to require substantial allegations that potential members 'were together the victims of a single decision, policy, or plan.' " *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *15 (Rosenthal, J.) (quoting *Mooney*, 54 F.3d at 1213). "Some courts place an emphasis on finding 'some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency.' " *Id.* (quoting *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003)). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *Id.* (quoting *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005)); *see also Barron*, 242 F. Supp. 2d at 1104 ("The mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences.").

In cases where plaintiffs have alleged FLSA violations across a company's multiple locations, courts have held that "[i]f there is a reasonable basis to conclude

that the same policy applies to multiple locations of a single company, certification is appropriate." *Rueda*, No. H-10-4937*, 2011 WL 2566072, at *4; *see also Vargas v. Richardson Trident Co.*, No. H-09-1674, 2010 WL 730155, at *6 (S.D. Tex. Feb. 15, 2012) (certifying a class of store managers working in various locations under supervision of different individuals because there was evidence of a common policy); *Blake v. Colonial Savings, F.A.*, Civ. A. No. H-04-0944, 2004 WL 1925535 (S.D. Tex. Aug. 16, 2004) (approving notice to loan officers in the defendant's Dallas office and those in remote locations based on evidence that unlawful overtime policies applied to all locations).

On the other hand, "FLSA violations at one of a company's multiple locations generally are not, without more, sufficient to support company-wide notice." *Rueda*, No. H-10-4937*, 2011 WL 2566072, at *4; *see also Harper v. Lovett's Buffet Inc.*, 185 F.R.D. 358, 362-63 (M.D. Ala. 1999) (refusing to include in a class employees of a chain's other restaurants when the evidence of FLSA violations was limited to a single restaurant); *but see Donohue v. Francis Servs., Inc.*, No. Civ. A. 04-170, 2004 WL 1406080 (E.D. La. June 22, 2004) (holding that employers should not be able to "escape FLSA liability by making sure to underpay vast numbers" of their employees and then claim that the class definition is too broad.). In *Rueda*, the court denied the plaintiffs' motion to extend their collective action certification, which had been granted to one subclass of employees working at one particular site, Garrett Yard, to include all nonexempt company hourly employees who performed manual labor. The court reasoned that the four affidavits submitted in support of extending conditional certification did not "present[ ] sufficient evidence of a policy of denying overtime pay outside the Garrett Yard to meet even the low burden required for conditional certification" because the affiants merely "asserted awareness of other workers" complaining they were not paid overtime wages or for all the hours that they worked.' " *Rueda*, No. H-10-4937*, 2011 WL 2566072, at *5 (internal quotations omitted). The court held that these affidavits did not support certification of a subclass of thousands of employees who performed manual labor outside the Garrett Yard site. *Id.*

Courts have at times refused to certify a class, even conditionally, when the relevant legal question would "require a highly individualized, fact-intensive inquiry." *See, e.g.*, *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *16. Other courts have noted that a "decision to certify, even if subject to correction at the decertification stage, is not without consequences" because "[t]oo much leniency at the notice stage can lead to a frivolous fishing expedition conducted by the plaintiff at the employer's expense" and "extreme leniency at the notice stage can result in conditional certification that must later be revoked at the eve of trial . . . when it becomes obvious that manageability concerns make collective action impossible." *In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, No. H-11-2266, 2012 WL 3308880, at *20 (quoting *Lang v. DirecTV, Inc.*, No. 10–1085, 2011 WL 6934607, at *6 (E.D. La. Dec.30, 2011)) (internal quotations and alterations omitted). In *Aguirre*, the Court denied a motion to certify a class of individuals who worked as coach leaders and claimed that they were improperly categorized as exempt employees; the court held that "[b]ecause the exempt or nonexempt status of the opt-in plaintiffs would need to be determined on an employee-by-employee basis, litigating this case as a collective action would not be efficient." *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *23.

However, the mere "the possibility that the Court will be drawn into a series of minitrials on the facts" is not dispositive of a motion for classification. *See Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *4. In *Jaso*, this Court granted plaintiff's motion for conditional certification of approximately 30 to 50 representatives of an oilfield services company who regularly worked more than twelve (12) hours in a day and more than eighty (80) hours in a week, and alleged that they were underpaid. *Id.* at *1, *3. This Court rejected the defendant's argument that it was exempt from the FLSA's overtime requirements under the applicable regulations because "[t]he employer, not the employee, has the burden to prove that an FLSA exemption applies," and because the plaintiff "set[ ] forth his estimate of the number of similarly situated nonexempt [representatives] based on his 'personal knowledge.' " *Id.* at *4–*5. "Read with the light burden applicable at this

preliminary stage in mind, it is reasonable to conclude that Jaso bases his estimate on personal observations of the job responsibilities, pay received, and hours worked by other [representatives] at [the company]." *Id.*

For purposes of conditional certification under the FLSA, "[s]imilarly situated does not necessarily mean identically situated." *Id.* at *4 (citing *England*, 370 F. Supp. 2d at 507). Rather, the plaintiff must show only that he and the employees in the proposed class are "similarly situated in terms of job requirements and similarly situated in terms of payment provisions." *Id.* (citing *Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 825 (N.D. Tex. 2007); *see also Heeg v. Adams Harris, Inc.*, 907 F. Supp. 2d 856, 862 (S.D. Tex. 2012) (quoting and applying this standard from *Ryan*); *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 468 (S.D. Tex. 2012) (same). Conversely, "if the job duties among potential members of the class vary significantly, then class certification should not be granted." *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *4; *Walker*, 860 F. Supp. 2d at 468 (quoting *Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. H-08-1212, 2008 WL 5204149, at *2 (S.D. Tex. Dec. 11, 2008)). Nonetheless, the "similarly situated" requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance). *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *4; *see also Heeg*, 907 F. Supp. 2d at 862 (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996)).

## III.    Evidentiary Objections

SCSI objects to and moves to strike substantial portions of the declaration of Malaska, which she has attached in support of her Motion for Conditional Certification. *See* Dkt. No. 30; Dkt. No. 24, Ex. 1. SCSI argues that Malaska's stated belief that other potential parties would join the lawsuit is conclusory and speculative. Dkt. No. 30 at ¶ 1. SCSI argues:

> Plaintiff's declaration addresses only her own job. Plaintiff provides no evidence that she has personal knowledge of any of the other potential

members of a proposed collective action, much less the entire population of SCSI's many employees. Her declaration suggests, truthfully, that she works alone every day, and so do the other providers by SCSI. The Plaintiff's proposal to certify a collective action of more than 1,400 current employees, plus numerous previous employees, cannot be based on her personal circumstances.

Dkt. No. 30 at ¶ 2. SCSI argues that Malaska's declaration fails to comport with Federal Rule of Evidence 602 and Federal Rule of Civil Procedure 56(c). *Id.* at ¶ 1, ¶ 4. SCSI moves the Court to strike Plaintiff's declaration "as to the objectionable parts described" or, in the alternative, discounted by the Court in support of Malaska's certification of the collective action. *Id.* at ¶ 6.

Malaska argues that her declaration is based on her personal knowledge. Dkt. No. 31 at 4. Malaska also argues that Federal Rule of Civil Procedure 56(c) does not govern the evidentiary standard at the notice stage for motions to conditionally certify collective actions under FLSA. *Id.* at 2 (citing *Lee v. Metrocare Services*, 980 F. Supp. 2d 754 (N.D. Tex. 2013); *Kelley v. Cal Dive Int'l, Inc.,* No. G–13–001, 2013 WL 2190010, at *1 (S.D. Tex. May 20, 2013) (applying more "relaxed evidentiary standard" at the notice stage); *Vargas v. HEB Grocery Co.,* No. SA12–cv–116–XR, 2012 WL 4098996, at *2 (W.D. Tex. Sept. 17, 2012); *McKnight*, 756 F. Supp. 2d at 803 ("It is not appropriate at [the notice stage] to require the plaintiffs to present evidence that would be required to survive a motion for summary judgment.")).

Federal Rule of Evidence 602 states that a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. Evidence to prove personal knowledge may consist of the witness's own testimony. *Id.* Whether a witness possesses the requisite personal knowledge is a conditional relevancy question to be determined under Rule 104(b). Fed. R. Evid. 602 advisory committee's note. Therefore, all that is required is enough evidence for a reasonable juror to find that it is more likely than not that the witness's testimony is based on firsthand

knowledge. Steven Goode & Olin Guy Wellborn III, *Courtroom Handbook on Federal Evidence* (2017) (citing *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132) (10th Cir. 2014). A witness need not claim to be absolutely certain about the accuracy of her observations. *Id.* Testimony phrased in terms of "I believe" or "I think" or which in some other manner concedes a modicum of doubt does not necessarily fail for lack of personal knowledge. *Id.* (citing *M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982)).

Malaska's declaration largely describes her employment with SCSI, her Job Description (which is attached as an exhibit), the use of her personal car to drive to clients' homes, the time-keeping systems she used as an employee at SCSI, her pay being that of an hourly wage, her instances of working more than forty (40) hours per week, the memo issued by Saldivar regarding a mandatory meeting in San Antonio to learn about the EVV system (which is attached as an exhibit), and the fact that Malaska does not have a list of the current or former providers who worked at SCSI, but that she is "generally aware" from SCSI's Employee Handbook and the deposition testimony of Saldivar that there are about 1,400 providers who work for SCSI. Dec. of Malaska, Dkt. No. 24, Ex. A at ¶ 1–12. SCSI affirms that it employs about 1,400 providers. *See* Saldivar Dep., Dkt. No. 29, Ex. A, p. 10, line 8.

Malaska also declares, "I believe that if other Providers were given notice of this lawsuit and invited to join, that they would do so." Dec. of Malaska, Dkt. No. 24, Ex. A at ¶ 12. She further declares that:

> I believe that other former and current Providers would be interested in joining this lawsuit if they were notified that the way they were being compensated by SCSI was improper, that they could be entitled to recover their unpaid wages, and especially if they were told that they were protected from retaliation should they join this case. However, I do not have a list of the names and phone numbers of all of the Providers who worked for SCSI.

*Id.* at ¶ 13.

Aside from the two quoted passages beginning with "I believe," Malaska's declaration provides information squarely within her personal knowledge. In the two areas where Malaska states that other providers would be interested in joining the lawsuit, she prefaces her statements with the term "I believe" and contextualizes her statements through her own admission that she "was not really ever at the SCSI offices with other Providers" and that she does not have a list of the providers so that she can contact them. *Id.* at ¶ 12. The Court finds that Malaska's declaration comports with Federal Rule of Evidence 602, and therefore SCSI's Objection to Malaska's Declaration is overruled.

## IV.    Analysis

The evidence is undisputed that SCSI has the same Job Description for all of its providers. *See* Saldivar Dep., Dkt. No. 24, Ex. 2, p. 22, lines 10-18. The evidence is also undisputed that all providers were required to record their time worked on job sheets (and, later, the EVV system), SCSI did not keep track of the providers' travel time, SCSI did not pay providers for their travel time, and that SCSI did not pay providers for time spent at the EVV roll-out meetings in February and March 2015. Dkt. No. 24 at 9; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 16, line 12 to p. 17, line 3; p. 22, lines 11-25; p. 63, lines 18-25; p. 64, line 21 to p. 65, line 20; p. 75, lines 6-12.

SCSI argues that Malaska has failed to carry her burden to establish a suitable foundation for showing that a "broad and diverse collection of potential opt-ins" are "similarly situated." Dkt. No. 29 at 2. SCSI argues that SCSI's providers are "highly individualized" and that "[a]s individual caregivers in their clients' homes, providers perform different duties for each of their clients, and they are necessarily paid differently, because they work different hours." Dkt. No. 24 at 2 (citing Saldivar Dep., Dkt. No. 29, Ex. A, p. 10, line 15 to p. 11, line 5; p. 17, line 5 to p. 18, line 10). SCSI also argues that Malaska was unique in that she reached full-time status due to her hours, but that most providers worked part-time. *Id.* at 29–

30; Saldivar Dep., Dkt. No. 29, Ex. A, p. 26, line 13 (stating that "maybe 50" providers employed by SCSI were full-time employees).

SCSI also argues that the practices of supervisors differ across SCSI's four offices that span thirty-four (34) counties. Dkt. No. 29 at 3. SCSI alleges that "[t]he different supervisors controlled how overtime is determined." *Id.* (citing Saldivar Dep., Dkt. No. 29, p. 47, lines 13-15).[4] Finally, SCSI argues that the nature of the providers' job means that the 1,400 or more providers cannot be "similarly situated." SCSI alleges, and Malaska does not dispute, that each provider works alone, each provider develops and must follow an individual care plan that is specialized for each client, each client's needs are different, meaning that each client's care requires different hours, skill levels, and frequency of visits. *Id.* According to SCSI, granting Malaska's motion would collectivize the claims of over 1,400 individuals "whose working conditions and hours of work are highly individualized; and the claims will require evidence at trial of each individual claimant who may choose to opt in." *Id.* at 3. The Court examines the arguments, exhibits, and applicable law to evaluate whether conditional certification is appropriate as to each of Malaska's two claims.

A.   Off-the-clock Claim

Malaska has the burden of making a preliminary factual showing that a similarly situated group of potential plaintiffs exists for her claim that providers were not paid for their hours driving in between clients' homes and for attending a mandatory meeting on how to use the new EVV system. Malaska thus must make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to her in relevant respects given the claims and defenses asserted; and (3) those

---

[4] As SCSI failed to attach the relevant page of the Saldivar Deposition, the Court does not have the relevant cited testimony before it. Accordingly, the Court treats this point as an unsupported assertion.

individuals want to opt in to the lawsuit. *See In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, No. H-11-2266, 2012 WL 3308880, at *24.

Malaska has attached the Job Description for providers which states that providers "[m]ust have own transportation and be able to travel within the area covered by the agency." Dkt. No. 24, Ex. 1-E, at 2. Saldivar testified through deposition that the Job Description as provided to Malaska is the job description provided to all of SCSI's providers. Saldivar Dep., Dkt. No. 24, Ex. 2, p. 22, at lines 11-25. Saldivar also testified through deposition that in neither of the two time-keeping systems that SCSI employed during the period in question was the employee paid for the drive time that they spend between clients' homes. *Id.* at p. 65, at lines 16-20.

Malaska also attaches a Memorandum from Saldivar addressed to "All Attendant Employees" that states:

> In an effort to comply with the new Electronic Visit Verification Implementation scheduled for March 1st, 2015 we are requiring all attendants employed with Saldivar Primary Home Care to attend a mandatory meeting in order to orientate and instruct on the new requirements to clock in and out when ever [sic] an attendant works their scheduled hours at a clients [sic] home. This meeting will only take an hour to orientate and answer any questions that you may have.

Dkt. No 24, Ex. 1-F, at 1. In the line describing the location and time of the meeting, the Memorandum provides:

> San Antonio PHC/CBA Department
> . . .
> February 25, 2015
> 6:00 Pm [sic]-???

*Id.*

Additionally, in the Job Description provided to all SCSI providers, under the heading of "Duties and Responsibilities," the Job Description states, "Employee is accountable for maintaining and improving own job knowledge and skills through

continuing education and professional development" and "attend[ing] relevant in-house inservice programs when applicable" and "attend[ing] outside seminars or courses in job-related areas." Dkt. No 24, Ex. 1-A, at 3. Saldivar also acknowledged through deposition that the words used in the relevant memo indicated that the meeting in San Antonio was mandatory, and that SCSI did not pay employees for attending this meeting. Dkt. No. 24, Ex. 2, p. 75, lines 6-12.[5] She also testified that employees were not paid for similar meetings held in the other locations, including Hondo, Loredo, and Alice. *Id.*, p. 78, lines 13-24. Saldivar also testified that all 1,400 of SCSI's Providers are nonexempt. *Id.*, p. 29, lines 8-10.

Through this evidence, which applies uniformly to all SCSI Providers, Malaska has provided "substantial allegations that potential members 'were together the victims of a single decision, policy, or plan.' " *See Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *15 (quoting *Mooney*, 54 F.3d at 1213). Because there have been no representations by SCSI that the timekeeping practices regarding compensation for transport between clients' homes or for the meeting regarding the new time-keeping system differed between offices, there is a "reasonable basis to conclude that the same policy applies to multiple locations of a single company" and, therefore, "certification is appropriate." *See Rueda*, No. H-10-4937*, 2011 WL 2566072, at *4; *see also Vargas v. Richardson Trident Co.*, No. H-09-1674, 2010 WL 730155, at *6. Additionally, the facts of Malaska's claim and those of potential opt-in plaintiffs are similar enough that hearing the cases together would promote judicial efficiency. *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *15; *Barron*, 242 F. Supp. 2d at 1103.

SCSI argues that the nature of Malaska's work should cut against certification on all grounds because it is "highly individualized." Dkt. No. 29 at 2 (presumably referring to the legal terminology used in *Aguirre*, No. H-05-3198, 2006

---

[5] Saldivar testified through deposition that employees were not paid "[b]ecause it was an informative meeting. . . . -- it was basically to help them to be able to continue to do their work . . . . And if they couldn't and didn't want to go, they didn't have to – they didn't go."

Dep. of Saldivar, Dkt. No. 24, Ex. 2, p. 75, lines 14-20.

U.S. Dis. LEXIS 22211, at *16). SCSI argues that the work of Malaska and other providers is highly individualized because, as individual caregivers in their clients' homes, providers perform different duties for each of their clients, and they are necessarily paid, differently, because they work different hours. *Id.* However, the term "highly individualized" as used in *Aguirre* was referring to work that would require a "fact-intensive inquiry." *See Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *16. Here, the commonality of the facts between Malaska and the prospective class members on the off-the-clock issue would not require a fact-intensive inquiry about the nature of their work. Furthermore, the standard for conditional certification requires that the Plaintiff show only that she and the employees in the proposed class are "similarly situated in terms of job requirements and similarly situated in terms of payment provisions." *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *4; *Ryan*, 497 F. Supp. 2d at 825; *Heeg*, 907 F. Supp. 2d at 862. While the type of tasks, the number of hours, and other conditions of employment differ among providers, the material aspects of the off-the-clock claim is consistent across all 1,400 of them. Providers need not be "identically situated" to be "similarly situated" for the purposes of this claim. *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *4 (citing *England*, 370 F. Supp. 2d at 507 (M.D. La. 2005)). Additionally, the fact that the providers reported to managers across four different offices is not dispositive of the "similarly situated" inquiry of this claim, given the evidence of common pay policy regarding transportation and the "mandatory" meeting. *Cf. Vargas v. Richardson Trident Co.*, No. H-09-1674, 2010 WL 730155, at *6 (certifying a class of store managers working in various locations under supervision of different individuals because there was evidence of a common policy).

Because Malaska has provided evidence showing that there is a reasonable basis for crediting the assertion that all 1,400 Providers may have been aggrieved by Malaska's off-the-clock complaint, and that—by virtue of their Job Description and SCSI's time-keeping practices—they are similarly situated to Malaska for the purposes relevant to this claim, the Court proceeds to determine whether Malaska has made a showing that those individuals may want to opt in to the lawsuit. The

evidence is uncontested that the work of SCSI's providers was done alone in clients' homes, and Malaska testified that she rarely went to the SCSI offices with other providers. Therefore, Malaska had little opportunity to ascertain other individuals who would want to opt in to the lawsuit. Therefore, the posture of the instant case is different from those of other cases where employees work together at a particular site. *Cf. Rueda*, No. H-10-4937, 2011 WL 2566072, at *4. Here, Malaska has provided evidence sufficient to show that the other SCSI providers were subject to the same SCSI practice of not being paid for hours worked during transport between clients' homes and for the lack of pay for the meeting regarding the EVV system. Because of the particularly isolated nature of the providers' work, the Court finds that Malaska has overcome the fairly lenient standard in showing that a similarly situated group of potential plaintiffs exists.

B.    <u>Overtime Claim</u>

Malaska also seeks conditional certification of her claim that SCSI does not pay proper overtime to SCSI providers. As nonexempt employees, providers are entitled to overtime pay calculated at one and one half times their regular rate of pay for all hours worked in excess of forty (40) in a workweek. 29 U.S.C. § 207, *et seq.*; Saldivar Dep., Dkt. No. 24, Ex. 2, p. 29, lines 8-18. Malaska alleges that SCSI does not pay its providers the correct overtime rate of pay, nor does it pay providers for all of the overtime hours worked. Dkt. No. 24 at 8.

As part of her motion for conditional certification, Malaska attaches timesheets purporting to show that Malaska worked more than forty hours per week in the pay periods of January 1, 2015 to January 15, 2015 and January 16, 2015 to January 31, 2015. *Id.* (citing Dkt. No. 24, Ex. 1-C). Malaska alleges that SCSI did not pay her overtime wages for the overtime hours she worked, nor did SCSI pay her the appropriate overtime rate:

> Specifically, the Vesta Job Sheets confirm that for the first week of the 1/1/15- 1/15/15 pay period, Malaska worked 44 hours, and the second week worked 51.5 hours. Thus, for this pay period, Malaska

worked 15.5 hours of overtime. However, she was only paid for working 5 hours of overtime. Similarly, the Vesta Job sheets confirm that for the first week of 1/16/15- 1/31/15 pay period, Malaska worked 50 hours, and the second week worked 76.5 hours. Thus, for this pay period, Malaska worked 46.5 hours of overtime. However, she was only paid for working 39.5 hours of overtime.

Dkt. No. 24 at 8 (internal footnotes omitted).

Throughout her briefing, Malaska does not provide a factual basis for allegations that the other 1,400 SCSI employees were not paid appropriate overtime. Furthermore, Saldivar testified through deposition that providers are "technically considered part-time employees," although noted that when they are scheduled more than 40 hours per week, they are then classified as full-time. Dep. of Saldivar, Dkt. No. 29, Ex. 1, p. 26, lines 1-4. Saldivar testified that Malaska "was more like a fill-in provider . . . because she would pick up extra clients . . . . [S]he didn't have a set schedule. So she wasn't, per se, always full time." *Id.*, p. 26, lines 19-23. Saldivar also testified through deposition that SCSI carried "maybe 50" full-time Providers. *Id.*, p. 26, lines 11-13. The Court notes that it is unclear as to how Saldivar was classifying Malaska or other Providers who were generally considered part-time providers but "carried full-time hours, at times." *Id.*, p. 26 at lines 5-18, p. 27 at lines 10-16. However, Saldivar did testify that "there's not many like [Malaska]." *Id.*, p. 27, lines 18-20.

Based on the briefings and attached exhibits, there is no reasonable basis to conclude that the policies directed at Malaska was the result of a common policy generally applicable to the other 1,400 SCSI employees. The briefings and attached exhibits do not include identifiable facts or a legal nexus that would bind the claims of Malaska with other SCSI employees. *See Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *15 (quoting *Barron*, 242 F. Supp. 2d at 1103). Malaska's motion for conditional certification on the overtime issue centers completely on her circumstances. *See id.*; *England*, 370 F. Supp. 2d at 507. Furthermore, even if the Court could draw an inference from Malaska's allegations and Saldivar's deposition testimony that there were some instances where SCSI did not properly pay other

employees overtime, the "mere fact that violations occurred cannot be enough to establish similarity, as that would not that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences." *Barron*, 242 F. Supp. 2d at 1104.

Furthermore, granting certification on this overtime issue to 1,400 potential plaintiffs would create serious manageability concerns because the parties and Court would need to consider the overtime records of a potentially enormous number of opt-in plaintiffs. *Cf. In re Wells Fargo Wage & Hour Employment Practices Litig. (No. III)*, No. H-11-2266, 2012 WL 3308880, at *20; *Aguirre*, No. H-05-3198, 2006 U.S. Dis. LEXIS 22211, at *23. While in *Jaso*, this Court did grant a plaintiff's motion for conditional certification on overtime claims, it did so for a class of approximately 30 to 50 representatives. *Jaso*, No. 2:15-CV-269, 2015 WL 11144603, at *1, *3. Additionally, in that case, the plaintiff made specific allegations that the representatives of the oilfield services company regularly worked more than twelve (12) hours in a day and more than eighty (80) hours in a week. *Id.* Here, because the asserted class is twenty-eight times larger than that of *Jaso* and asserts far fewer allegations regarding other workers' overtime claims, the same result cannot be reached. For the reasons discussed above, the Court denies Malaska's motion for conditional certification on the overtime claim.

## V. Conclusion

Having considered the Motion, the response, the reply, and the relevant law, this Court **GRANTS IN PART** and **DENIES IN PART** Malaska's Motion for Conditional Certification, Dkt. No. 24. The Court **OVERRULES** Defendant's objection to the deposition of Malaska, Dkt. No. 30.

The Court grants conditional certification on Plaintiff's off-the-clock claim, i.e., the claim that Malaska and other providers were not paid for transportation time and time spent at a mandatory meeting regarding the new EVV system. The Court therefore conditionally certifies this matter as a collective action under 29

U.S.C. § 216(b) with respect to all current and former Providers employed by SCSI during any workweek between January 1, 2015 to the present.

The Court denies conditional certification for Malaska's overtime claim, finding that, at least at this stage, the record does not show sufficient evidence that 1,400 SCSI employees were similarly situated to Malaska on this overtime issue.

The Court **ORDERS**, consistent with the rulings in this Order:

- Plaintiff to file by April 28, 2017:

    o (1) a Notice Letter

    o (2) a Notice of Consent Form; and

    o (3) a Proposed Order approving both for transmission

- SCSI shall file objections, if any, to the Notice Letter and Notice of Consent Form by May 5, 2017.

- Parties shall file an amended Joint Discovery/Case Management Plan by May 12, 2017.

SIGNED this 20th day of April, 2017.

Hilda Tagle
Senior United States District Judge